UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
YU Y. HO, XUE X. LIU, BING Q. LIANG, JING
Y. HUANG, TIAN Q. LU, XIU Y. LU, YAN Y.
CHEN, AI M. HUANG, JIN L. WU, JING D.
HUANG, LAN M. HUANG, ZHI E. WEN, and JIN
F. ZHAO,

| | |
|---|---|
| Plaintiffs, | 11 Civ. 2855 (PKC) |
| -against- | MEMORANDUM<br>AND ORDER |

SIM ENTERPRISES, INC., EXPO ENTERPRISE,
INC., SUN LY FASHION, INC., DENEY AND
JEN INC, JUN RENG ZHOU, and JING XIAN
MEI,

Defendants.
---------------------------------------------------------x

CASTEL, U.S.D.J.

> USDS SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 5-14-14

       Plaintiffs are thirteen former workers at a garment factory on Walker Street in

Chinatown. They bring this action alleging violations of the Fair Labor Standards Act ("FLSA")

and the New York Labor Law ("NYLL") by the corporate entities alleged to own the factory

operation and Jun Reng Zhou and Jing Xian Mei, two individuals alleged to be the plaintiffs'

managers. The action proceeded to trial without a jury. This Memorandum and Order sets forth

the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed. R. Civ. P. For

the reasons that follow, judgment will be entered in favor of plaintiffs to the extent set forth

below.

**FINDINGS OF FACT**

I.      **The Parties**

    A.      **The Plaintiffs**

       1.   Plaintiffs Yu Yee Ho, Xue Xing Liu, Bing Quan Liang, Jing Yi Huang, Tian Quan Lu, Xiu Yu Lu, Yan Ying Chen, Ai Mei Huang, Jin Lin Wu, Jing Die Huang, Lan Mei Huang, Zhi En Wen, and Jin Feng Zhao are thirteen individuals of Chinese origin who worked at a garment factory located on the second floor of 72 Walker Street in the Chinatown neighborhood of Manhattan (the "Walker Street Factory").

       2.   Plaintiffs complain of acts or omissions of the defendants occurring from April 27, 2005 through October 14, 2010.

       3.   Prior to 2005, the garment production enterprise at the Walker Street Factory was located on Broome Street near Mott Street in Manhattan (the "Broome Street Factory"). Both of the individual defendants and all of the plaintiffs, except Xiu Yu Lu, Zhi En Wen, and Jin Feng Zhao, worked at the Broome Street Factory before it moved to Walker Street.

       4.   Plaintiff Yu Yee Ho was employed at the Walker Street Factory as a hemmer from its opening until its closing on October 14, 2010.

       5.   Plaintiff Xue Xing Liu was employed at the Walker Street Factory, primarily as a hemmer and pocket sewer, from its opening until September 11, 2010.

       6.   Plaintiff Bing Quan Liang was employed at the Walker Street Factory as a presser and ironer from its opening until its closing on October 14, 2010.

7. Plaintiff Jing Yi Huang was employed at the Walker Street Factory from April 2005 until its closing on October 14, 2010.  His job was to layer pieces of fabric together for sewers to sew.

8. Plaintiff Tian Quan Lu was employed at the Walker Street Factory as a hanger and wrapper from the factory's opening to its closing on October 14, 2010. He is the father of plaintiff Xiu Yu Lu and the husband of Yan Ying Chen; the three worked together as a unit at the Walker Street Factory.

9. Plaintiff Xiu Yu Lu was employed at the Walker Street Factory as a hanger and wrapper.  She worked part-time at the factory in 2005 and full-time from 2006 to October 2, 2010.

10. Plaintiff Yan Ying Chen was employed at the Walker Street Factory as a hanger and wrapper from the factory's opening to its closing on October 14, 2010.

11. Plaintiff Ai Mei Huang was employed at the Walker Street Factory, primarily as a pocket sewer, from the opening of the factory to its closing on October 14, 2010.

12. Plaintiff Jin Lin Wu was employed at the Walker Street Factory as an ironer from the opening of the factory to its closing on October 14, 2010.

13. Plaintiff Jing Die Huang was employed at the Walker Street Factory from its opening through August 2006, and from late April 2007 to the factory's closing on October 14, 2010.  He worked with his wife, Lan Mei Huang, on the button machine, making button holes and sewing buttons onto garments.

14. Plaintiff Lan Mei Huang was employed at the Walker Street Factory from its opening through August 2006, and from late April 2007 to October 2008. She worked with her husband, Jing Die Huang, on the button machine, making button holes and sewing buttons onto garments.

15. Plaintiff Zhi En Wen was employed at the Walker Street Factory as a presser from January 2010 through the factory's closing on October 14, 2010. He worked with plaintiff Bing Quan Liang.

16. Plaintiff Jin Feng Zhao was employed at the Walker Street Factory as a thread cutter from late April 2008 to the factory's closing on October 14, 2010.

**B.** **The Defendants**

17. Defendants Sim Enterprises, Inc., Expo Enterprise, Inc., Sun Ly Fashion, and Deney and Jen Inc. are New York corporations that have been served with process but have failed to respond to the complaint. On June 16, 2011, the Clerk entered a Certificate Noting Default with respect to each of the corporate defendants. (Dkt. No. 63) Plaintiffs have not moved for a default judgment against these defendants.

18. The four corporations ran the factory for various periods of time: Sim Enterprises from on or about June 26, 2005 to October 14, 2006; then Expo Enterprise, Inc. from on or about October 15, 2006 to May 31, 2008; then Sun Ly Fashion, Inc. from on or about June 1, 2008 until December 26, 2009; then Deney and Jen Inc. from on or about January 24, 2010 until October 14, 2010. (Complaint ¶ 9) Sun Ly Fashion Inc. and Deney and Jen Inc. maintained bank

accounts at the United Orient Bank in Chinatown, and from 2008 through 2010 plaintiffs were paid in part with checks from these bank accounts.  (Pl. Ex. 30, Def. Ex. E)  In addition, all four companies are listed as employers on plaintiffs' W-2 forms for the tax years including the above periods.  See, e.g., Def. Exs. D, G, M.  Plaintiffs received W-2 forms from Sim Enterprises Inc. in 2005 and 2006, from Expo Enterprise, Inc. in 2006, 2007, and 2008; from Sun Ly Fashion Inc. in 2008 and 2009, and from Deney and Jen Inc. in 2010. (Id.)

19. Defendant Jun Reng Zhou worked at both the Broome Street Factory and the Walker Street Factory.  All of the plaintiffs called him the "Boss" or "Ah Ying."  Zhou was present in the courtroom throughout the trial, and several plaintiffs identified him as the factory boss.

20. Defendant Jing Xian Mei also worked at both the Broome Street Factory and the Walker Street Factory.  All of the plaintiffs referred to her as "Sister Han" or "Ah Han."  Mei was present in the courtroom throughout the trial, and several plaintiffs identified her as the factory manager.

**C.**     **The Walker Street Factory**

21. The Walker Street Factory opened in 2004 and remained in operation until October 14, 2010.

22. Prior to working at the factory, both individual defendants and all of the plaintiffs, except Xiu Yu Lu, Zhi En Wen, and Jin Feng Zhao, worked at the

Broome Street Factory.  Before Broome Street, both individual defendants and a few of the plaintiffs worked at another garment factory located in Brooklyn.

23. The Walker Street Factory was located on the second floor of 72 Walker Street.  The factory floor had an open layout, with machines (including sewing machines, pressers, and button machines) set up throughout the floor. Generally, around thirty people worked on the factory floor at any given time. There was an office adjacent to the factory floor with two desks inside.

24. At both the Broome Street Factory and the Walker Street Factory, there was a PA system on the factory floor.  The systems were used by Zhou and Mei to make announcements to all workers on the floor.

25. At the Broome Street Factory and the Walker Street Factory, plaintiffs predominantly worked on garments for Dress Barn and Lane Bryant. Defendants offered no contrary evidence on this point.  In his deposition, defendant Zhou stated that he was sent by his boss to pick up labels for Lane Bryant garments.  (Zhou Dep., Pl. Ex. 37, 21:3 – 22:2)

26. Dress Barn and Lane Bryant are retail brands operated by wholly-owned subsidiaries of Ascena Retail Group, Inc., a public company whose stock is traded on the NASDAQ exchange.  Dress Barn operates 826 retail and outlet stores in 48 states, and Lane Bryant operates 788 retail and outlet stores in 46 states.  Ascena Retail Group, Inc., Annual Report (Form 10-K) (Nov. 25, 2013) (Pl. Ex. 32).

27. Plaintiffs also occasionally worked on garments for Notations, Inc.  Notations, Inc. produces clothing that is sold in department stores across the United States.  (Pl. Ex. 36)

**D.**     **Wage and Hour Practices at the Walker Street Factory**

28. The hours and days worked by each of the plaintiffs varied.  In general, plaintiffs worked six or seven days per week, beginning their work day between 8:30 a.m. and 9:00 a.m. and leaving the factory between 7:00 p.m. and 9:00 p.m., with a lunch break lasting between thirty and sixty minutes. When business was slow, some of the plaintiffs would leave as early as 4:00 p.m.  On the other hand, when the factory received rush orders, plaintiffs would arrive at work earlier, as early as 6:30 a.m., and would work later, generally past 9:30 p.m. and occasionally as late as 3:00 a.m. or 4:00 a.m.

29. All of the plaintiffs except for Jin Feng Zhao were paid by the piece: that is, they were paid a predetermined rate for each garment that they worked on. For example, Jing Yi Huang was paid two to two-and-a-half cents for each set of fabric layers that he put together.  Plaintiff Zhao was paid $100, $150, or $200 once or twice per month.

30. All plaintiffs, including Zhao, maintained detailed notebooks listing for each day the number and type of pieces that they worked on either individually or collectively as a family or as part of a group doing the same type of work.  (Pl. Exs. 1, 4, 6, 8, 10, 12, 15, 17, 19, 22, 26, 28)

31. Plaintiffs were paid with both cash and checks.

32. The factory enterprise used two different types of checks in connection with plaintiffs' compensation.  Plaintiffs explained the distinction between the two checks by using the descriptors "cash checks" and "company checks"; the latter type was also referred to as a "W-2 check."  So-called "company checks" were typewritten, unsigned checks that listed individual plaintiffs as payees but that were never given to the plaintiffs.  (Pl. Exs. 54, 56; Def. Ex. I)  The amounts in these "company checks" were uneven, apparently reflecting the deduction of withholding taxes.  Plaintiffs would be given cash instead of these "company checks."  From 2008 through 2010, when work at the factory slowed down and plaintiffs' compensation became irregular and delayed, plaintiffs were paid in part with "cash checks," which were checks for even dollar amounts written out to cash or with a blank payee line.  (Pl. Ex. 3)  "Cash checks" are distinct from "company checks" and would actually be distributed to plaintiffs.  Plaintiffs would bring these "cash checks" to the United Orient Bank in Chinatown and exchange them for cash there.

33. In the bank records of Sun Ly Fashion Inc., the "cash checks" appear as debits in the checking account, while "company checks" do not appear at all.  Compare Pl. Ex. 3 at P169 with Pl. Ex. 30 at P1346; Pl. Ex. 56 with Pl. Ex. 30 at P1251, 1256.  The Court finds that these "company checks" were never distributed to plaintiffs.  No evidence was presented as to whether the corporate entities actually paid withholding taxes to a taxing authority for plaintiffs' benefit.

E.  **Managerial Authority at the Walker Street Factory**

34. Zhou hired most of the plaintiffs; sometimes, Mei was present at the meetings at which individual plaintiffs were hired by Zhou.  Plaintiffs Ai Mei Huang, Jing Die Huang, and Lan Mei Huang were hired by Zhou's wife at a factory in Brooklyn and followed Zhou to the factories at Broome Street and Walker Street.  Mei hired plaintiff Zhao.

35. When individuals would come to the factory looking for work, they would meet with Zhou or Mei.  For instance, prior to being hired plaintiff Liu inquired with Mei regarding potential employment at the factory.  Zhou and Mei were both in charge of hiring new employees.

36. The piece rate for each garment was set by Zhou, and if any employee had an issue with the set pay rate for any garment, they spoke with Zhou.  For instance, if plaintiff Tian Quan Lu, a buttoner, worked on an order of shirts with particularly tight button holes that made the buttoning process more difficult and time-consuming, he would raise the issue with Zhou and ask for a higher pay rate—five cents per shirt instead of the usual four cents.  When plaintiffs complained about the piece rates, Zhou would sometimes tell them that he could not pay the standard rate because the company that ordered the garments was not paying him much for the work.  At one point in 2006, plaintiffs Jing Die Huang and Lan Mei Huang temporarily left their jobs because Zhou would not increase the piece rate for a particularly difficult garment order.

37.  Both Zhou and Mei paid plaintiffs.  As discussed above, plaintiffs were paid with both cash and checks.  <u>See</u> <u>supra</u> at ¶¶ 30-31.

38.  When plaintiffs were paid with checks, Zhao or Mei prepared and presented the checks.  Either Zhao or Mei would stamp each check with a signature stamp.  The stamped signature on some of the checks received by plaintiffs is illegible; on a few other checks, the name Yu Ling Shi appears on the signature line.  (Pl. Ex. 3; Tr. 32:11-22)  Yu Ling Shi is listed as the president and secretary of Sun Ly Fashion in the company's bank account documents.  (Pl. Ex. 30 at P1234)

39.  When plaintiff Liu stopped coming to work at the factory for a time in the summer of 2010, Zhou asked her to return and threatened that if she did not return, he would not to pay her the money she was owed.

40.  There was a punch clock at the factory.  Plaintiffs used this punch clock, but the hours entered into each employee's punch card through the machine did not reflect the actual hours worked by the employee.  Plaintiffs were instructed by Zhao over the factory PA system to punch the clock when they came in and after eight hours had elapsed.  This tactic was employed because Zhou was concerned that the Department of Labor might investigate the factory, as it had once before in 2006.  Plaintiffs would keep working after punching out.

41.  Zhou was in charge of the day-to-day activities of the factory.  He primarily worked at a desk in the office located on the factory floor.  The factory records, including piece cards, checks, a notebook listing piece rates, and time

cards, were kept in this office.  He would sometimes hold employee meetings in his office to inform the workers of delays in the payment of their wages. Zhou would come out of the office to push his employees to work harder when rush orders came in.

42. When the factory received a rush order, Zhou provided lunch for the factory workers, and sometimes arranged for a car service to drive the workers home after a late night.  In both cases, he paid for these expenses out of his own pocket.

43. Mei also directed plaintiffs' work.  She used a desk in the office, though she also sat at a sewing machine out on the factory floor.  Her time was split 50-50 between operating the sewing machine and performing other tasks.  When she was not working at the sewing machine, she generally worked in the office.

44. Mei was responsible for collecting plaintiffs' piece cards.  The cards were stored in a desk in the office.

45. Zhou told plaintiffs the deadlines by which orders had to be completed.  Both Mei and Zhou gave plaintiffs instructions as to their work each day.  Plaintiffs did not leave at a set time each day; rather, Zhou and Mei from time to time told plaintiffs when they could leave for the day.  When the factory received a rush order, Zhou and Mei would press plaintiffs to come in earlier and work later to complete the order.  When new orders came in after a slow period, Zhou or Mei would call the plaintiffs and instruct them to come in.

Conversely, when business was slow and few orders were received, Zhao or Mei would instruct plaintiffs to go home for the day.

46. Zhou signed forms relating to employees' health insurance and housing applications.

### F.   Mysterious Non-Parties: Chen, Liang, Mui, Tom, and Elaine

47. Zhou and Mei identified five individuals that they claim held authority in the operation of the Broome Street Factory and the Walker Street Factory: three alleged owners of the factory named Chen, Liang, and Mui, a man named Tom, and a secretary named Elaine, also referred to as the "chubby girl."  No credible evidence supports the defendants' claims that all or some of these five individuals were plaintiffs' employers or managers.

48. Both Zhou and Mei identified a man named Chen as the true boss and owner of the factories.  Based upon the demeanor of the witnesses and the content of their testimony, the Court concludes that Zhou and Mei fabricated their testimony concerning Chen.  Neither knew whether Chen was his first or last name.  Mei claimed to have met Chen only once, when she was hired by him in approximately 2003.  She was unable to describe his appearance.  In her testimony, she claimed that Chen would occasionally call her and direct her to do work.  This conflicted with her declaration, in which she stated, "I do not know who the boss was; we lacked direct supervision."  (Mei Decl. ¶ 16)

49. Zhou stated that he was originally hired to work at the Broome Street Factory by Chen.  According to Zhou, he saw Chen in the Walker Street Factory "very, very seldom."  (Tr. 419:2-3)

50. Zhou claimed that Chen would visit the Walker Street Factory in the middle of the night, and would call Zhou from the factory with instructions, telling him to "do this and that."  (Tr. 423:25-425:1)  Since no plaintiff ever saw Chen at the factory and plaintiffs sometimes worked through the night until three or four in the morning, it is unclear when these secretive visits could have taken place.  Zhou further claimed that during these night visits Chen would write down the piece rates for each garment, leave the workers' wages in the office, and leave documents for the company accountants in the office. None of this testimony is credible.

51. Mei's home address is listed on a bank account statement for Deney and Jen Inc.  (Pl. Ex. 30 at P1230)  Confronted with this bank statement at trial, Mei claimed that at some point before the factory closed she spoke with Chen and agreed to receive Chen's mail at her home address while Chen was out of the country.  (Tr. 400:25-401:8)  This testimony was knowingly false.

52. Aside from Chen, Zhou also identified two other individuals, Liang and Mui, who were present when he was hired.  He believed that these two men were Chen's business partners, although he did not speak with them during the hiring meeting and never saw either of them again after the meeting.

53. In March 2010, Zhou extended a loan of $10,000 to the factory by writing a check to Deney and Jen Inc.  (Pl. Ex. 30 at P1353)  This circumstance is

powerful evidence that Zhou was no mere employee but functioned as an employer and owner.  At trial, he claimed that Chen asked him for the loan because of a cashflow problem, and that the loan was repaid within a week. (Tr. 460:6-461:10)

54. None of the plaintiffs has ever seen or heard of Chen, Liang, or Mui.  Further, none of the plaintiffs has ever seen any person directing the actions of Zhou or Mei at the factory.

55. At trial, for the first time, Zhou and Mei both identified another person, Tom, as an authority figure at the factory.  Neither made any mention of Tom in their depositions or declarations.

56. Mei claimed that Tom asked her to perform certain tasks, including handing out checks and cash to pay the factory workers.  She further claimed Tom would instruct her to order workers to come back to the factory; she did not recall how often this would occur, stating only that it was fewer than thirty times per month.  Zhou also claimed that Tom directed him to perform unspecified tasks.  At trial, plaintiff Liang identified Tom as someone present when Zhou met with and hired Liang, but maintained that Tom was not a factory boss.  (Tr. 50:21-51:23)  Liang considered Tom a partner of Zhou at the Broome Street Factory; Tom was present at the Walker Street Factory, if at all, only for the first few months after the factory's move.

57. At the time that the Walker Street Factory opened, a woman named Elaine worked in the office at the Walker Street Factory as a secretary.  She was no longer working at the factory as of 2008.  The factory employees all referred

to her as the "chubby girl."  When present, Elaine was apparently sometimes responsible for calculating the amounts that the factory workers were owed based on the piece cards that they submitted.  Mei testified that Elaine directed her to perform unspecified tasks.

58. Mei claimed that either Chen or Tom would call her at the factory and instruct her to hand out wages to the factory employees.  She claimed that generally, Chen or Tom would tell her that he had left the checks or cash in a certain location in the office.  According to Mei, the cash or checks would be in a stack tied together with a rubber band, and inside of a small paper bag that she described as similar to one used to hold a cup of coffee.  (Tr. 366:17-19, 374:8-16)  Sometimes she would be instructed to pick up cash from Tom, who would hand it to her in "a stack tied together by a rubber band" in an envelope from his car several blocks away from the factory.  (Tr. 374:3-21)  Mei denied ever having counted or divided up the cash.  She stated that the cash she was given would be "put together with the name of the worker."  (Tr. 373:18-23)

59. At trial, Zhou stated that he had not had any contact with Tom, Elaine, Chen, Liang, or Mui since the commencement of this lawsuit.  (Tr. 438:13-439:13)

### G.    Business Slowdown and Closure of the Walker Street Factory

60. From 2005 to 2007, the Walker Street Factory had steady business, and plaintiffs were paid regularly on a weekly or bi-weekly basis.

61. Beginning in 2008, business at the factory slowed down and fewer orders were received.  From this point on, plaintiffs were not paid regularly and

would often be paid only part of what they were owed according to their piece rates and production.  It was at this point that plaintiffs were first paid with "cash checks."

62.   For example, during this period plaintiff Jin Feng Zhao was given a check for $150 although she was owed $200.  She pleaded with Mei for the remaining $50, which she needed to purchase food for her grandson who was recovering from surgery.  Mei told Zhao that she could not pay her the extra amount because there was not enough money in the account and that Zhou would be penalized if the account was overdrawn.

63.   During this period, in order to induce plaintiffs to continue working at the factory, Zhou repeatedly reassured the employees that he would personally pay them what they were owed once money came in from orders.  On several occasions, Zhou told his employees that he would pay them "every cent" that they were owed once he recovered money in a personal injury lawsuit relating to the death of his son.  He informed employees of this in meetings held in his office and also made an announcement to this effect over the PA system.

64.   On October 14, 2010, the day that the factory closed, plaintiffs went to the factory and were handed unsigned checks by Zhou and Mei.  At that time, Zhou claimed that these checks reflected the amounts owed to each plaintiff. Plaintiffs were told that there was not money in the checking account, but that when there was money, Zhou or Mei would stamp the checks so that the plaintiffs could cash them.

65. Zhou's testimony regarding his contact with Chen on and after October 14, 2010 was inconsistent and incredible. Zhou testified that on October 14, 2010 Chen and Tom came to the Walker Street Factory and handed him the unsigned paychecks to distribute to the factory employees. Initially, Zhou testified that Chen asked him to tell the workers to call Chen if they had any problems getting paid; he then changed his testimony, saying that Chen would call the workers himself and that Zhou did not give Chen's phone number to the workers. (Tr. 452:5-20) Zhou claims to have lost Chen's phone number and that he does not know how to reach him now. Zhou also claims that he is owed over $7,000 by Chen. While he initially claimed that he "very, very seldom call[ed]" Chen with his cell phone, he later changed his testimony, claiming that one week after the factory closed he called Chen "again and again and no one answered." (Tr. 453:19-22, 458:3-16)

66. After the factory closed, Zhou packed up all of the factory's documents for the factory owners.

67. Mei testified that shortly before the factory closed, Chen called her to tell her that the factory was not getting paid for its orders, and that the factory would shut down as a result. She could not explain why Chen shared this information with her specifically rather than with anyone else. Mei claims that she is owed $6,500 in unpaid wages from the factory, but that she never attempted to contact Chen after the factory closed. Even though she claims that she knew that Chen was the person to contact regarding pay problems,

Mei testified that she never mentioned Chen's name to any other factory employee at any point.  (Tr. 400:10-16)

## H.       Credibility Determinations

68.   Among the thirteen plaintiffs who testified at trial were speakers of four different dialects of Chinese: Cantonese, Toisan, Fuzhou, and Wenzhou.  All testimony was taken with the assistance of interpreters.  Further, each of the plaintiffs previously resided in rural areas of China; on average, the parties had approximately five to six years of education, and two plaintiffs had no education at all.  Defendant Zhou is the only party to have completed a high school education.  The combination of these factors made credibility determination in this case unusually difficult: although the transcript reflects that many witnesses' answers to the inquiries of both counsel and the Court were non-responsive, the degree to which such testimony is attributable to difficulties in translation, witnesses' lack of understanding, or similar factors is difficult to ascertain.

69.   Each plaintiff's testimony was largely consistent with his or her declaration and with the testimony of the other plaintiffs.  In general, plaintiffs exhibited a calm and forthcoming demeanor.  Several plaintiffs gave testimony that was inconsistent with information in their declarations, particularly with respect to the timing of the factory's move from Broome Street to Walker Street.  These inconsistencies did not undermine the overall impact and credibility of their

testimony.  The Court finds the plaintiffs' testimony credible and cumulatively substantial.

70.   The Court finds the testimony of Mei incredible.  Her testimony frequently differed dramatically from the testimony she gave in her deposition and declaration.  When asked about the PA system, her testimony changed three times in the course of a short interval on the witness stand: after claiming that there was a PA system on the floor that she never used, she then stated that she personally used the PA system to tell workers when they had a phone call, and finally she stated that there was no PA system after all.  (Tr. 383:1-385:25)  Further, her demeanor reflected evasiveness: when counsel or the Court inquired as to a sensitive topic such as her relationship with Chen or Zhou, she would blink rapidly, speak considerably more quickly, and look down.

71.   The Court finds the testimony of Zhou incredible.  His testimony was frequently shown to differ dramatically from the statements in his deposition and declaration.  In one instance, after stating that Chen would write the piece rates in the factory in the middle of the night, Zhou was confronted with his deposition statement that a person named Shxia wrote out the piece rates.  He attributed the difference to a problem with the interpretation of his deposition testimony.  (Tr. 431:10-12)  Aside from this single instance, Zhou simply acknowledged each major discrepancy between his testimony and his prior statements under oath without providing any explanation.  Throughout his testimony, Zhou's demeanor indicated evasiveness and discomfort.

**CONCLUSIONS OF LAW**

I.    **Plaintiffs are Covered Employees Within the Meaning of FLSA.**

1.    The minimum wage and overtime requirements of FLSA apply to employees

who "[are] engaged in commerce or the production of goods for commerce, or

[are] employed in an enterprise engaged in commerce or in the production of

goods for commerce . . . ."  29 U.S.C. §§ 206(a), 207(a)(1).  Employees

engaged in manufacturing plants where goods are produced for commerce are

expressly included within the general scope of "production" coverage.  29

C.F.R. § 776.15(b).  Further, garments or "any part of ingredient" thereof are

goods produced in commerce within the meaning of FLSA.  29 C.F.R. §

776.20(b)-(c).

2.    Undisputed evidence demonstrates that the Broome Street Factory and the

Walker Street Factory were engaged in the production of goods for interstate

commerce, namely garments for Dress Barn, Lane Bryant, and Notation, and

that plaintiffs worked on such goods.  Defendants have presented no evidence

disputing that plaintiffs worked primarily or exclusively on goods for

interstate commerce.  "[T]he burden of effecting segregation between covered

and noncovered work as between particular workweeks for a given employee

or as between different groups of employees is upon the employer."  29

C.F.R. § 776.4(b).  Accordingly, plaintiffs are covered employees within the

meaning of FLSA.

**II.**     **Zhou and Mei Were Employers Within the Meaning of FLSA and the NYLL.**

3.     Under FLSA, " 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."  29 U.S.C. § 203(d).  FLSA also defines "employ" as "includ[ing] to suffer or permit to work."  Id. § 203(g).

4.     The NYLL defines "employer" to include "any person . . . employing any individual in any occupation, industry, trade, business or service" or "any individual . . . or any organized group of persons acting as employer."  NYLL §§ 190(3), 651(6); see also Irizarry v. Castimatidis, 722 F.3d 99, 117 (2d Cir. 2013) (cert denied, 134 S.Ct. 1516 (2014)).  The question of whether "the tests for 'employer' status are the same under the FLSA and the NYLL . . . has not been answered by the New York Court of Appeals."  Irizarry, 722 F.3d at 117.  Nonetheless, district courts in this Circuit have consistently interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA.  See, e.g., Moon v. Kwon, 248 F. Supp. 2d 201, 236 n.17 (S.D.N.Y. 2002) ("New York law adopts a similarly broad definition of "employer" in the context of its minimum wage and overtime laws.").

5.     "The Supreme Court has recognized that 'broad coverage [under the FLSA] is essential to accomplish the [statute's] goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency.' "  Irizarry, 722 F.3d at 103 (citing Tony & Susan Alamo Found v. Sec'y of Labor, 471 U.S. 290, 296 (1985)).  Accordingly, the

- 21 -

Supreme Court has "consistently construed the Act liberally to apply to the furthest reaches consistent with congressional direction." Id.  The determination of whether an employer-employee relationship exists under FLSA is based on an "economic reality" test taking account of the totality of the circumstances.  Id. at 104.  The "economic reality" test applies equally to whether workers are employees and to whether managers or owners are employers.  See Herman v. RSR Sec. Servs., Ltd., 172 F.3d 132, 139 (2d Cir. 1999).  New York courts also apply an "economic reality" test to determine employer status under the NYLL.  See, e.g., Bonito v. Avalon, 967 N.Y.S.2d 19, 20 (1st Dep't 2013).

6.  In Carter v. Dutchess Community College, 735 F.2d 8 (2d Cir. 1984), the Second Circuit identified four factors for determining the 'economic reality' of a putative employment relationship: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Barfield v. NYC Health & Hosps. Corp., 537 F.3d, 132, 142 (2d Cir. 2008) (quoting Carter, 735 F.2d at 12).  These factors do not constitute "a rigid rule for the identification of a FLSA employer," but rather "provide a nonexclusive and overlapping set of factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA."  Id. at 143 (internal quotations and citations omitted).

- 22 -

7. Courts must take additional considerations into account when a plaintiff seeks to hold an individual liable for labor law violations.  When assessing "whether an individual within a company that undisputedly employs a worker is personally liable for damages as that worker's 'employer,' " Irizarry, 722 F.3d at 105, courts apply the four-factor test articulated in Carter and also consider "other factors bearing upon the overarching concern of whether the alleged employer possessed the power to control the workers in question."  Id. (citing RSR Sec. Servs., 172 F.3d at 139.  The most salient of these "other factors" is "operational control," i.e. an individual defendant's possession of control over a company's actual operations in a manner that relates to a plaintiff's employment.  Id. at 109.  "A person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment."  Id. at 110.  As the Second Circuit explained, courts should "require some degree of individual involvement in a company in a manner that affects employment-related factors such as workplace conditions and operations, personnel, or compensation—even if this appears to establish a higher threshold for individual liability than for corporate 'employer' status."  Id. at 109.

8. Defendant Zhou was plaintiffs' employer within the meaning of FLSA and the NYLL.  Although her case presents a closer question than Zhou's, defendant Mei was also plaintiffs' employer within the meaning of these statutes.

9. Both Zhou and Mei had the authority to hire employees and in fact did hire each of the plaintiffs in this case.  Both Zhou and Mei supervised and

controlled plaintiffs' work schedules and conditions of employment.  Each of
them instructed plaintiffs to come to work when new orders came in after a
slow period.  Whenever a rush order was received, both Zhou and Mei
ordered and pressured plaintiffs to come in earlier, leave later, take shorter
lunch breaks, and work harder.  In directing plaintiffs' work and determining
the days and hours on which plaintiffs were to work, Zhou and Mei exercised
operational control over the plaintiffs: the defendants' roles within the factory
enterprise, and the decision-making authority that their roles entailed,
"directly affect[ed] the nature or conditions of the employees' employment."
Irizarry at 110.

10. Zhou determined the rate and method of plaintiffs' payment: he set the piece
rate for each garment.  When a dispute over the piece rate arose, employees
consulted with Zhou, who had the authority to increase the piece rate on a
given garment or to deny any such request.  His testimony that the mysterious
Chen performed this task during covert visits to the Walker Street Factory in
the middle of the night is not credible, while plaintiffs' detailed recounting of
specific instances of pay disputes resolved by Zhou is credible.  Further,
plaintiffs were actually paid by Zhou and Mei, both of whom had the authority
to distribute plaintiffs' pay and endorse plaintiffs' paychecks.

11. Zhou also personally made guarantees regarding plaintiffs' delayed
compensation and personally covered certain of plaintiffs' work-related
expenses.  After the slowdown that began in 2008, when plaintiffs began to be
underpaid for their work, Zhou repeatedly personally promised to pay

plaintiffs what they were owed.  During rush orders, Zhou sometimes paid

from his own pocket for plaintiffs' lunches and for a car service to drive

plaintiffs home after a late night at the factory.

12.   In opposing the conclusion that they were plaintiffs' employers, defendants

raise two main arguments, neither of which alters the preceding analysis.

Defendants note that there is little or no evidence that they were owners of the

business or shared in the profits of the enterprise.  But it is not necessary for

an individual to be an owner of the business or to share in its profits in order

to be deemed an employer under FLSA.  Indeed, ownership of a business

alone is insufficient to qualify an individual as an employer under Carter or

Irizarry.  Ownership is relevant to the inquiry only insofar as it relates to an

individual's operational control over employees or the "economic realities" of

the relationship between the individual and plaintiff employees.

13.   Zhou and Mei also contend that they should not be held liable as employers

because they acted at the direction of other individuals—namely, Chen, Tom,

and Elaine.  But as discussed, there is no credible evidence that any of these

people exercised any managerial control over anyone at the Walker Street

Factory.  Indeed, there is no evidence other than defendants' often

contradictory testimony that Chen even exists.  In any event, defendants have

cited no authority for their implicit argument that the delegation of authority

in a business enterprise immunizes from liability an individual that otherwise

meets the definition of an employer under FLSA or the NYLL from liability.

Though Zhou and Mei seek to cast their roles at the factory as mere passive

conduits analogous to a low-level human resources employee handing out paychecks, the record establishes that Zhou and Mei played a far more substantial role in the operation of the factory.  Accordingly, Zhou and Mei are employers within the meaning of FLSA and the NYLL, and may thus be held liable for the enterprise's labor law violations.

### III.   Defendants Violated Federal and State Wage Laws

14.   Both FLSA and the NYLL impose minimum wage and overtime requirements on the employers of covered employees.  Three such requirements are relevant here.  First, under federal and state law employers must pay covered employees a specified minimum wage.  29 U.S.C. § 206; NYLL § 652.[1] Second, federal and state law require that covered employees working more than forty hours per workweek must be paid at least one and one half times their regular wage.  29 U.S.C. § 207; 12 N.Y.C.R.R. 142-2.2.  Third, New York law requires employers to pay covered employees an extra hour's compensation at the minimum wage rate for days on which they worked more than ten hours under applicable "spread-of-hours" regulations.  12 N.Y.C.R.R. §142-2.4.  Spread-of-hours wages may be recovered in addition to federal and state overtime claims.  See, e.g., Yang v. ACBL Corp., 427 F. Supp. 2d 327,

---

[1] The federal minimum wage for the period during which compensable FLSA violations occurred (2008 through 2010) was as follows: prior to July 24, 2008, $5.85 per hour; from July 24, 2008 through July 23, 2009, $6.55 per hour; and on or after July 24, 2009, $7.15 per hour.  29 U.S.C. § 206.  The minimum wage under New York law during the relevant period was as follows: during calendar year 2005, $6.00 per hour, during calendar year 2006, $6.75 per hour, from January 1, 2007 through to July 24, 2009, $7.15 per hour, and on and after July 24, 2009, $7.25 per hour.  NYLL § 652.

338-41 (S.D.N.Y. 2005); <u>Chan v. Sung Yue Tung Corp.</u>, 03 Civ. 6048 (GEL),

2007 WL 313483, at *25 (S.D.N.Y. Feb. 1, 2007).

15.   New York law also sets requirements for the frequency of payment for certain

types of workers.   Specifically, as is relevant here, the NYLL requires that

manual workers be paid "weekly and not later than seven calendar days after

the end of the week in which the wages are earned . . . ."   NYLL § 191(1)(a).

Where wages are not timely paid, "the court shall allow such employee to

recover the full amount of any underpayment" of wages that the worker was

entitled to earn.   NYLL § 198(1-a).   Thus, plaintiffs are entitled to recover the

full amount of their unpaid wages when those wages would have been higher

than the applicable minimum wage.

IV.   <u>**Damages**</u>

A.   <u>**Statute of Limitations**</u>

16.   Plaintiffs' NYLL claims are subject to a six-year statute of limitations.   NYLL

§§ 198(3), 663(3).   In general, FLSA claims are subject to a two-year statute

of limitations, except that a cause of action based on a willful violation may

be commenced within three years of the violation.   29 U.S.C. § 255(a).   An

employer has willfully violated FLSA if it either acted knowingly or "showed

reckless disregard for the matter of whether its conduct was prohibited by the

statute . . . ."   <u>McLaughlin v. Richland Shoe Co.</u>, 486 U.S. 128, 133 (1988).

17.   Here, defendants' violation of the labor laws was willful.   Defendant Zhou

instructed plaintiffs over the PA system to enter inaccurate hours into a punch

clock in order to hedge against potential liability from a Department of Labor investigation.  The existence of the punch clock scheme demonstrates that both individual defendants were aware of applicable labor laws.  Moreover, both Zhou and Mei conceded at trial that plaintiffs had been unpaid or underpaid for a substantial period before the factory shut down; both stated that the amounts on the unsigned checks that they distributed to plaintiffs on October 14, 2010 reflected amounts that were owed to plaintiffs.  Plaintiffs' evidence demonstrates that Zhou and Mei willfully violated the labor laws, and defendants produced no credible evidence to rebut this conclusion.

18. Plaintiffs' complaint was filed on April 27, 2011.  Accordingly, plaintiffs may recover damages under the NYLL for violations dating back to April 27, 2005 and under FLSA for violations dating back to April 27, 2008.

## B.  Compensatory Damages

### 1.  Minimum Wage, Overtime, and Unpaid Wages

19. Under both FLSA and the NYLL, each plaintiff is entitled to recover any shortfall in the payment of (1) the ordinary minimum wage rate for 40 of the hours that he or she worked each week, and (2) the overtime wage rate of one and one half times the regular pay rate for any remaining hours worked in a week.  See 29 U.S.C. §§ 206, 207; NYLL § 652; 12 N.Y.C.R.R. §§ 142-2.1, -2.2.  Because plaintiffs may not recover these compensatory damages under both FLSA and the NYLL, plaintiffs seek only to recover damages based on the New York minimum wage requirement, which was higher than the federal

minimum wage requirement throughout the period during which damages under FLSA are recoverable.  29 U.S.C. § 206; NYLL § 652.

20.   Further, under New York law plaintiffs are entitled to recover the full amount of unpaid wages when those wages would have been higher than the applicable minimum wage.  NYLL §§ 191(1)(a), 198(1-a).  Thus, during any period in which wages were unpaid in violation of New York law, plaintiffs seek to recover the greater of the minimum wage due and their ordinary pay rate for that period.

21.   Under both federal and New York law, employers are required to keep accurate records of their employees' wages and hours.  29 C.F.R. § 516; NYLL § 195; 12 N.Y.C.R.R. § 142-2.6.  "These requirements are not mere technicalities, but substantive obligations that are 'fundamental underpinnings' of FLSA and critical to ensuring the statute's effectiveness, for an employer's '[f]ailure to keep accurate records can obscure a multitude of minimum wage and overtime violations.' " Moon v. Kwon, 248 F. Supp. 2d 201, 218 (S.D.N.Y. 2002) (quoting Wirtz v. Mississippi Publishers Corp., 364 F.2d 603, 607 (5th Cir.1966)).  Accordingly, although an employee suing for unpaid or underpaid wages bears "the burden of proving that he performed work for which he was not properly compensated," that burden is lessened when the employer fails to comply with its record-keeping obligations. Anderson v. Mr. Clemens Pottery Co., 328 U.S. 680, 687 (1946).

22.   Both FLSA and the NYLL provide a burden-shifting framework for proving wage violations.  Under FLSA, an employee may meet his or her burden of

proof by producing "sufficient evidence from which violations of [FLSA] and the amount of an award may be reasonably inferred." Reich v. S. New Eng. Telecomms. Corp., 121 F.3d 58, 66 (2d Cir. 1997) (citation omitted). If an employee offers such evidence, an employer must then "come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." Mt. Clemens Pottery, 328 U.S. at 688-89. If the employer fails to do so, the court may enter judgment in the employee's favor, using the employee's recollection to determine damages, "even though the result be only approximate." Reich, 121 F.3d at 67 (citing Mt. Clemens Pottery at 687-88). New York law similarly provides that where an employer fails "to keep adequate records . . . the employer in violation shall bear the burden of proving that the complaining worker was paid wages, benefits and wage supplements." NYLL § 196-a.

23. Where an employer fails to comply with applicable recordkeeping requirements, a plaintiff employee may carry his burden "if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Mt. Clemens Pottery, 328 U.S. at 687. Employees may establish such claims based on their recollections. Id. at 686-88. Where plaintiffs provide prima facie proof of labor law violations, the burden is on the defendant to rebut their evidence with accurate records. Id. at 687-88.

24. Here, the record establishes that defendants disregarded their recordkeeping obligations under federal and state law.  With the exception of four punch cards covering a four-week period of plaintiff Liang's tenure at the factory and two such cards covering two weeks of plaintiff Jing Die Huang's tenure, defendants have produced no records of plaintiffs' hours whatsoever.  (Def. Exs. A1, A2, A3, A4, B1, B2)  Although defendants presented W-2 forms for seven plaintiffs, plaintiffs adduced evidence undermining the credibility of these documents.  Plaintiffs showed that the factory produced but did not distribute "W-2 checks" in amounts designed to reflect tax deductions.  These checks were never cashed and never distributed to the payees.  This evidence undermines the veracity of the W-2 documents, and aside from producing the documents themselves defendants have offered no support for their accuracy and no explanation for the practices involving the false "W-2 checks."  "[A] defendant whose wrongful act creates the difficulty in assessing damages is not entitled to complain that the amount of damages escapes accurate measurement."  Sand, Siffert, et al, Federal Jury Instructions, Civil § 77.01 at 77-8 (2013 Ed.) (citing Austin v. Parker, 672 F.2d 508, 521 (5th Cir. 1982)); see also Mt. Clemens Pottery, 328 U.S. at 688 ("The damage is therefore certain.  The uncertainty lies only in the amount of damages arising from the statutory violation by the employer. . . It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages.").

25. Thus, plaintiffs' evidence of their hours worked and wages earned is entitled to a reasonable inference of correctness which the defendants bear the burden

of negating under the framework established in <u>Mt. Clemens Pottery</u>.  <u>See</u> <u>Reich</u>, 121 F.3d at 66-67.  Because New York law imposes an even higher recordkeeping burden on employers, "a finding of FLSA liability . . . necessarily implies a finding of liability under New York law." <u>Doo Nam</u> <u>Yang v. ABCL Corp.</u>, 427 F.Supp. 2d 327, 337 n.15 (S.D.N.Y. 2005). Therefore, because plaintiffs have adequately established their claims based on their recollections and defendants failed to offer any credible evidence to rebut their claims, plaintiffs' recollection and documentation of hours worked and compensation owed is presumed to be correct.

26. Plaintiffs have submitted detailed damages calculations for each plaintiff on each cause of action in this litigation.  These calculations are derived from a combination of plaintiffs' statements based on their recollections and a set of twelve notebooks maintained by plaintiffs in connection with their employment at the factory.  Plaintiffs kept track of each garment order that each individual plaintiff worked on.  The notebooks are comprised of charts generally indicating the date on which the work was performed, the style number of each garment worked on, a Chinese language description of the garment, the number of pieces sewn, the piece rate, and the total earned for each garment type.  Defendants have produced no cogent or credible evidence to contradict the accuracy of these notations.

27. Moreover, the information contained in the notebooks is corroborated by its consistency with testimonial evidence provided by plaintiffs in their declarations.  For example, plaintiff Xue Xing Liu stated in her declaration

that in the summer of 2010, when business at the Walker Street Factory was slow, she found work at other factories until defendant Zhou asked her to return and threatened not to pay her if she would not.  Liu Decl. ¶ 10.  Liu's notebook and corresponding damages calculations reflect a period in 2010 from mid-June to mid-July during which she performed no work at the Walker Street Factory.  Pl. Ex. 6.

28.   Defendants have submitted no evidence on the issue of damages and have offered no alternative calculations for damages in this case.  The sole argument raised by defendants against plaintiffs' damages calculation is their contention that plaintiffs failed to take account of withholding taxes paid to the federal and state governments on their behalf by their employers, and that this omission undermines plaintiffs' damages calculations by an unspecified amount.  Defendants point to the set of W-2 forms introduced as evidence and cite a single instance of trial testimony that they claim shows that all thirteen plaintiffs did not factor withholding taxes into their damages calculations. (Tr. 278-79; Def. Exs, C, D, G, H, J, K, M)  As previously discussed, however, plaintiffs' evidence of defendants' opaque system of producing a paper record of "W-2 checks" that were never cashed or distributed to plaintiffs undermines the credibility of the information in the W-2 forms, and defendants failed to either produce any evidence supporting the credibility of the forms or to explain the questionable practice of producing false checks.

29.   In light of the above-discussed presumption in favor of plaintiffs' damages calculations, the defendants' failure to dispute or offer any evidence against

plaintiffs' damages calculations, and the Court's independent review of the
record and each plaintiff's calculations, plaintiffs' method of damages
calculation will be adopted as to each category of damages.  The Court's
damages calculation varies somewhat from the damages summary charts of
certain plaintiffs (but not from the underlying information derived from
plaintiffs' notebooks and recollections) to reflect corrections of computational
errors.  The following table sets forth each plaintiff's damages under the
NYLL:

| Plaintiff | NYS Minimum or Unpaid Wages Due | NYS Overtime Wages Due |
|---|---|---|
| Yu Yee Ho | $ 16,860.62 | $ 4,962.73 |
| Xue Xing Liu | $ 52,634.64 | $ 23,800.60 |
| Bing Quan Liang | $ 18,868.74 | $ 3,502.72 |
| Jing Yi Huang | $ 3,927.65 | $ 13,908.60 |
| Tian Quan Lu | $ 68,805.64 | $ 28,487.69 |
| Xiu Yu Lu | $ 33,177.54 | $ 6,939.09 |
| Yan Ying Chen | $ 68,805.64 | $ 28,487.69 |
| Ai Mei Huang | $ 41,605.02 | $ 34,583.38 |
| Jin Lin Wu | $ 6,239.26 | $ 16,121.90 |
| Jing Die Huang | $ 17,846.78 | $ 21,099.18 |
| Lan Mei Huang | $ 12,402.65 | $ 15,384.39 |
| Zhi En Wen | $ 5,002.88 | $ 580.79 |
| Jin Feng Zhao | $ 21,675.18 | $ 368.95 |

## 2.  Spread of Hours

30.  Under the NYLL, each plaintiff may recover a spread-of-hours premium equal
to one hour's wage for each day he or she worked in excess of ten hours.  See
12 N.Y.C.R.R. § 137-1.7.  Spread-of-hours wages may be recovered in
addition to federal and state overtime claims.  See, e.g., Yang v. ACBL Corp.,
427 F. Supp. 2d at 343; Chan v. Sung Yue Tung Corp., 2007 WL 313483 at
*25.  It is undisputed that plaintiffs were not paid a spread-of-hours premium.

31.    The following table sets forth the spread-of-hours premium owed to each

plaintiff under the NYLL:

| Plaintiff | Spread of Hours Damages |
|---|---|
| Yu Yee Ho | $        9,085.70 |
| Xue Xing Liu | $      10,301.25 |
| Bing Quan Liang | $        1,701.80 |
| Jing Yi Huang | $        4,741.60 |
| Tian Quan Lu | $        9,490.15 |
| Xiu Yu Lu | $        6,227.35 |
| Yan Ying Chen | $        9,490.15 |
| Ai Mei Huang | $        8,061.99 |
| Jin Lin Wu | $        2,181.60 |
| Jing Die Huang | $        3,887.67 |
| Lan Mei Huang | $        2,823.35 |
| Zhi En Wen | $          543.75 |
| Jin Feng Zhao | $          253.45 |

**3.    Total Compensatory Damages**

32.    The total compensatory damages awarded to each plaintiff are as follows:

| Plaintiff | Total Compensatory Damages |
|---|---|
| Yu Yee Ho | $      42,591.31 |
| Xue Xing Liu | $      86,736.49 |
| Bing Quan Liang | $      24,049.74 |
| Jing Yi Huang | $      22,577.84 |
| Tian Quan Lu | $    106,783.48 |
| Xiu Yu Lu | $      46,343.98 |
| Yan Ying Chen | $    106,783.48 |
| Ai Mei Huang | $      84,250.39 |
| Jin Lin Wu | $      24,542.76 |
| Jing Die Huang | $      43,140.68 |
| Lan Mei Huang | $      30,610.39 |
| Zhi En Wen | $        6,127.42 |
| Jin Feng Zhao | $      15,951.03 |

C.    **FLSA Liquidated Damages**

33.  An employer who violates FLSA is liable for any unpaid wages and an additional equal amount as liquidated damages.  29 U.S.C. § 216(b).  The employer may not be liable for liquidated damages if it demonstrates that its actions were in good faith and that it had reasonable grounds for believing that its actions or omissions did not violate FLSA.  29 U.S.C. § 260.  "[T]he employer bears the burden of establishing, by plain and substantial evidence, subjective good faith and objective reasonableness . . . . The burden, under 29 U.S.C. § 260, is a difficult one to meet, however, and double damages are the norm, single damages the exception."  Reich, 121 F.3d at 71 (citations and internal quotation marks omitted); see also Brock v. Wilamowsky, 833 F.2d 11, 20 (2d Cir. 1987) ("The Act does not authorize the court to decline to award liquidated damages, in whole or in part, unless the employer has established its good-faith, reasonable-basis defense.").

34.  Defendants did not attempt to establish good faith in this case.  Even if they had, they would have been unsuccessful for reasons previously discussed: in short, their violations of federal and state wage laws were willful.  Accordingly, defendants are liable for the full amount of liquidated damages under federal law.  Each plaintiff is thus entitled to recover liquidated damages under FLSA equivalent to 100 percent of the difference between the hourly wage he or she was paid and the applicable federally prescribed required minimum and overtime wage.

**D.**   **Liquidated Damages Under the NYLL**

35.   During the relevant period, the NYLL provided for liquidated damages

equivalent to 25% of unpaid wages due to a plaintiff under New York law.

NYLL § 198.[2]  Prior to November 24, 2009, liquidated damages were

awarded only for willful underpayments.  See Kuebel v. Black & Decker Inc.,

643 F.3d 352, 366 (2d Cir. 2011).  The test for willfulness under the NYLL

"does not appreciably differ from the FLSA's willfulness standard."  Id.

Willfulness in this context constitutes either knowledge by the employer that

his conduct is illegal or reckless disregard for whether it is statutorily

prohibited.  See McLaughlin, 486 U.S. at 133 (1988).  From November 24,

2009 on, the NYLL has provided liquidated damages of 25% of unpaid wages

without requiring a showing of willfulness.  NYLL § 198; 2009 Sess. Law

News of N.Y. Ch. 372 (A. 6963) (McKinney's); Kuebel, 643 F.3d at 366 n.9.

An employer is liable for such damages under the NYLL "unless the employer

proves a good faith basis to believe that its underpayment of wages was in

compliance with the law . . . ."  NYLL § 663.

36.   As discussed, defendants neither acted in good faith nor attempted to argue

that they did.  Further, defendants' violations of federal and state wage laws

were willful.  Accordingly, each plaintiff is entitled to liquidated damages

equal to 25 percent of unpaid wages under the NYLL.

---

[2] As of April 9, 2011, the NYLL provides for liquidated damages in an amount equal to 100% of unpaid wages due. Wage Theft Prevention Act, 2010 Sess. Law News of N.Y. Ch. 564 § 8380 (McKinney's).

E.     **Entitlement to Both FLSA and NYLL Liquidated Damages**

37.   District courts in this Circuit are divided on whether plaintiffs may recover

liquidated damages under both FLSA and NYLL.  Gurung v. Malhotra, 851 F.

Supp. 2d 583, 593 (S.D.N.Y. 2012).  A majority of courts have held that

plaintiffs may recover under both FLSA and NYLL, because the liquidated

damages provisions serve fundamentally different purposes.  Id.; see also Yu

G. Ke v. Saigon Grill, Inc., 595 F.Supp.2d 240, 261–62 (S.D.N.Y.2008) ("[A]

prevailing plaintiff who can justify both [FLSA] liquidated damages and state-

law [liquidated] damages should be eligible to recover both, since they . . .

serve fundamentally different purposes.") (internal quotation marks omitted);

Lanzetta v. Florio's Enterprises, Inc., 08 Civ. 6181 (DC), 2011 WL 3209521,

at *5-6 (S.D.N.Y. Jul. 27, 2011); Jin M. Cao v. Wu Liang Ye Lexington

Restaurant, Inc., 08 Civ. 3725 (DC), 2010 WL 4159391, at *5 (S.D.N.Y. Sep.

30, 2010); Callier v. Superior Bldg. Servs., Inc., 09 Civ. 4590 (ILG)(JMA),

2010 WL 5625906, at *3 (E.D.N.Y. Dec. 22, 2010).  These courts have

recognized that liquidated damages under FLSA are the functional equivalent

of prejudgment interest; they are "not a penalty exacted by the law, but rather

compensation to the employee occasioned by the delay in receiving wages due

caused by the employer's violation of the FLSA."  RSR Sec. Servs., 172 F.3d

at 142; see also Reich, 121 F.3d at 71 ("Liquidated damages under the FLSA

are considered compensatory rather than punitive in nature.").  Liquidated

damages under New York Labor Law, by contrast, are punitive in nature; they

" 'constitute a penalty' to deter an employer's willful withholding of wages

due."  Reilly v. NatWest Mkts. Group, Inc., 181 F.3d 253, 265 (2d Cir. 1999)

(quoting Carter v. Frito-Lay, Inc.,425 N.Y.S.2d 115, 116 (1st Dep't 1980)).

Further, one district court has noted that once an employer's willfulness has

been established, the language of both FLSA and the NYLL appears to require

that a plaintiff be awarded liquidated damages.  Lanzetta, 2011 WL 3209521;

see also Brock v. Wilamowsky, 833 F.2d 11, 20 (2d Cir. 1987) ("The Act

does not authorize the court to decline to award liquidated damages, in whole

or in part, unless the employer has established its good-faith, reasonable-basis

defense.").

38.  Other courts have disagreed with the majority view, holding that "a plaintiff is

not entitled to both federal and state liquidated damages because they serve

the same practical purposes in compensating the plaintiff and deterring wage

violations."  Li Ping Fu v. Pop Art Int'l Inc., No. 10 Civ. 8562 (DLC)(AJP),

2011 WL 4552436, at *5 (S.D.N.Y. Sept. 19, 2011), report & rec. adopted as

modified on other grounds, 2011 WL 6092309 (S.D.N.Y., Dec. 07, 2011); see

also Chun Jie Yin v. Kim, 07 Civ. 1236 (DLI)(JO), 2008 WL 906736, at *7

(E.D.N.Y. Apr. 1, 2008) ("[T]o the extent the 'liquidated damages' available

under the FLSA can properly be characterized as compensation, it is apparent

that the 'liquidated damages' available under the state statute compensates the

exact same harm—namely, the harm caused by the defendant's culpable state

of mind."); Jin v. Pac. Buffet House, Inc., 06 Civ. 579 (VVP), 2009 WL

2601995, at *9 (E.D.N.Y. Aug. 24, 2009) ("Regardless of the purpose, the

award under the FLSA is four times the award under state law, and thus is

more than sufficient to satisfy any punitive purpose the state law is intended to
serve.").

39.   Under New York law, a plaintiff may recover both NYLL liquidated damages
and prejudgment interest "because [the awards] serve fundamentally different
purposes." Reilly, 181 F.3d at 265.

40.   Each of the two liquidated damages provisions serves separate purposes on
behalf of separate sovereigns.  Defendants have made no argument against the
award of liquidated damages under both provisions.  This Court adopts the
rationale followed by the majority of district courts in this Circuit and
concludes that plaintiffs may recover liquidated damages under both FLSA
and the NYLL.

F.   **Liquidated Damages Calculation**

41.   The plaintiffs are entitled to recover the following liquidated damages:

| Plaintiff | NYLL Liquidated Damages | FLSA Liquidated Damages | Total Liquidated Damages |
|---|---|---|---|
| Yu Yee Ho | $ 10,647.83 | $ 21,823.35 | $ 32,471.18 |
| Xue Xing Liu | $ 21,684.12 | $ 40,497.98 | $ 62,182.10 |
| Bing Quan Liang | $ 6,012.43 | $ 14,554.80 | $ 20,567.23 |
| Jing Yi Huang | $ 5,644.46 | $ 4,808.20 | $ 10,452.67 |
| Tian Quan Lu | $ 26,695.87 | $ 43,539.33 | $ 70,235.20 |
| Xiu Yu Lu | $ 11,585.99 | $ 21,277.88 | $ 32,863.87 |
| Yan Ying Chen | $ 26,695.87 | $ 43,539.33 | $ 70,235.20 |
| Ai Mei Huang | $ 21,062.60 | $ 28,619.19 | $ 49,681.78 |
| Jin Lin Wu | $ 6,135.69 | $ 6,679.76 | $ 12,815.45 |
| Jing Die Huang | $ 10,785.17 | $ 16,134.57 | $ 26,919.73 |
| Lan Mei Huang | $ 7,652.60 | $ 6,528.17 | $ 14,180.76 |
| Zhi En Wen | $ 1,531.85 | $ 16,134.57 | $ 17,666.42 |
| Jin Feng Zhao | $ 3,987.76 | $ 13,971.38 | $ 17,959.13 |

G.    **New York Prejudgment Interest**

42.   Plaintiffs also seek an unspecified award of prejudgment interest on certain

unpaid wages claims and on damages for spread-of-hours violations.  Federal

courts have long held that prejudgment interest may not be awarded in

addition to liquidated damages for violations of the FLSA.  Thomas v. iStar

Fin., Inc., 652 F.3d 141, 150 n. 7 (2d Cir. 2011); Brock v. Superior Care, Inc.,

840 F.2d 1054, 1064 (2d Cir. 1988) (citing Brooklyn Sav. Bank v. O'Neil, 324

U.S. 697, 714–16 (1945)).  Plaintiffs may not recover prejudgment interest for

overtime and minimum wage violations occurring on or after April 27, 2008,

because the award of liquidated damages under FLSA serves as the functional

equivalent of prejudgment interest.

43.   At the same time, the Second Circuit has also held that ""[p]rejudgment

interest and liquidated damages under the Labor Law are not functional

equivalents" and thus may both be awarded for violations of state wage laws.

Reilly, 181 F.3d at 265.  The Court finds that plaintiffs are entitled to

prejudgment interest for the full duration of the spread-of-hours violations,

because FLSA provides no cause of action for spread-of-hours violations.

The Court also finds that plaintiffs are entitled to recover prejudgment interest

on their claims for unpaid wages accruing prior to April 27, 2008.

44.   Plaintiffs have not proposed an amount or method of calculating prejudgment

interest due.  Section 5001 of the CPLR governs the calculation of

prejudgment interest for violations of the NYLL.  See, e.g., Pavia v. Around

the Clock Grocery, Inc., 03 Civ. 6465 (ERK), 2005 WL 4655383, at *8

(E.D.N.Y. 2005).  Ordinarily, courts apply an interest rate of nine percent per annum in determining prejudgment interest due under New York law.  CPLR § 5004.  Under Section 5001(b) of the CPLR, "[w]here . . . damages were incurred at various times, [prejudgment] interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date."  To that end, courts have "wide discretion in determining a reasonable date from which to award pre-judgment interest." Conway v. Icahn & Co., 16 F.3d 504, 512 (2d Cir. 1994).

45. Here, because plaintiffs' damages arose over an extended period of time, the Court fixes as a "reasonable intermediate date" the midway point between the date of plaintiffs' earliest compensable claims, April 27, 2005, and the date on which the factory closed and most plaintiffs' employment terminated, October 14, 2010.  Thus, the Court calculates the accumulation of prejudgment interest beginning on January 20, 2008.

46. Accordingly, the Court finds that as of the date of this Memorandum and Order, defendants owe plaintiffs the following amounts in prejudgment interest, which the Court determined by multiplying the eligible damages amount (total spread of hours damages plus wage damages accumulating prior to 4/27/08) due to each plaintiff by the interest rate (0.09) and the amount of time passed (approximately 6.32 years):

| Plaintiff | Pre-4/27/08 Wages | Eligible Damages | Prejudgment Interest |
|---|---|---|---|
| Yu Yee Ho | $ 12,795.53 | $ 21,881.23 | $ 12,436.33 |
| Xue Xing Liu | $ 30,255.82 | $ 40,557.07 | $ 23,050.86 |
| Bing Quan Liang | $ 1,674.98 | $ 3,376.78 | $ 1,919.21 |
| Jing Yi Huang | $ 13,270.05 | $ 18,011.65 | $ 10,237.03 |
| Tian Quan Lu | $ 49,637.11 | $ 59,127.26 | $ 33,605.34 |
| Xiu Yu Lu | $ 16,220.64 | $ 22,447.99 | $ 12,758.46 |
| Yan Ying Chen | $ 49,637.11 | $ 59,127.26 | $ 33,605.34 |
| Ai Mei Huang | $ 23,732.27 | $ 31,794.27 | $ 18,070.47 |
| Jin Lin Wu | $ 15,117.83 | $ 17,299.43 | $ 9,832.24 |
| Jing Die Huang | $ 18,968.46 | $ 22,856.14 | $ 12,990.43 |
| Lan Mei Huang | $ 19,977.25 | $ 22,800.60 | $ 12,958.86 |
| Zhi En Wen | $ - | $ 543.75 | $ 309.04 |
| Jin Feng Zhao | $ - | $ 253.45 | $ 144.05 |

47.   This award shall continue accumulating at 9% per annum until judgment is entered.

H.   **Damages Summary**

48.   The total damages including prejudgment interest awarded to each plaintiff are as follows:

| Plaintiff | Total Damages |
|---|---|
| Yu Yee Ho | $ 87,498.83 |
| Xue Xing Liu | $ 171,969.45 |
| Bing Quan Liang | $ 46,536.18 |
| Jing Yi Huang | $ 43,267.54 |
| Tian Quan Lu | $ 210,624.02 |
| Xiu Yu Lu | $ 91,966.31 |
| Yan Ying Chen | $ 210,624.02 |
| Ai Mei Huang | $ 152,002.64 |
| Jin Lin Wu | $ 47,190.44 |
| Jing Die Huang | $ 83,050.84 |
| Lan Mei Huang | $ 57,750.01 |
| Zhi En Wen | $ 24,102.88 |
| Jin Feng Zhao | $ 34,054.21 |

49. The total damages awarded for all plaintiffs are $1,260,637.37.

## I.     **Joint and Several Liability**

50. The defendants are jointly and severally liable for the judgment.  Both Zhou

and Mei acted as plaintiffs' joint employer and each is responsible both

individually and jointly for defendants' violations of federal and state law.

See 29 C.F.R. § 791.2; Doo Nam Yang, 427 F. Supp 2d at 342-43.

## CONCLUSION

For the foregoing reasons, the Court concludes that plaintiffs have proven by a

preponderance of the evidence that the defendants violated FLSA and the NYLL in the manner

described herein.  The Court further finds that the plaintiffs have proven compensatory and

liquidated damages and prejudgment interest totaling $1,260,637.37, for which the defendants

are jointly and severally liable.


SO ORDERED.


Dated: New York, New York
       May 13, 2014

P. Kevin Castel
United States District Judge